# In the United States Court of Federal Claims

No. 12-05C
(Filed: November 19, 2018)

| | |
|---|---|
| AHMED HALIM,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Keywords: Breach of Contract;<br>Department of Housing and Urban<br>Development; Foreclosure Sale; Section 8<br>Housing; Statute of Limitations; Summary<br>Judgment; Mutual Mistake of Fact;<br>Impossibility |

*Carl A.S. Coan, III*, Coan & Lyons, Washington, D.C., for Plaintiff.

*Tanya B. Koenig*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, for Defendant, with whom were *Kenneth M. Dintzer*, Deputy Director, *Robert E. Kirschman, Jr.*, Director, and *Chad A. Readler*, Acting Assistant Attorney General. *Stacey E. Singleton*, Trial Attorney, U.S. Department of Housing and Urban Development, Of Counsel.

## OPINION AND ORDER

**KAPLAN, Judge.**

 Plaintiff Ahmed Halim purchased four apartment complexes from the Department of Housing and Urban Development ("HUD") at four separate foreclosure sales. Under the foreclosure sales contracts, he was obligated to make specified repairs to the properties within two years of closing. He was also required to ensure that the properties were continuously kept in compliance with HUD's Uniform Physical Condition Standards ("UPCS"). Compliance with the UPCS was also a condition of Mr. Halim's receipt of Section 8 housing assistance payments pursuant to the Housing Assistance Payment ("HAP") contracts he entered.

 The claims in this case arose out of HUD determinations that Mr. Halim failed to meet these obligations. As a result of those determinations, HUD retained moneys that Mr. Halim had left in escrow to guarantee that the repairs would be done. It also terminated his entitlement to continued receipt of housing assistance payments.

 In addition to his purchase of the four properties that are the primary subject of this action, Mr. Halim was the high bidder with respect to the sale of a fifth property but, for reasons set forth in detail below, HUD cancelled the sale. Mr. Halim claims that HUD acted in bad faith and in breach of contract when it retained the earnest money deposit it had collected from him as the successful bidder.

There are eleven counts in Mr. Halim's complaint. He seeks damages based on HUD's retention of the escrow money and its termination of rental assistance payments at two of the complexes he purchased. He requests rescission of the sales agreements for two other properties he purchased based on the doctrines of impossibility and mutual mistake of fact. And finally, he seeks damages to compensate him for HUD's retention of his earnest money deposit for the property sale that never closed.

The government has moved for summary judgment as to all eleven counts in Mr. Halim's complaint. Mr. Halim opposes the government's motion and has cross-moved for summary judgment as to eight of the eleven counts.

For the reasons set forth below, the government's motion for summary judgment as to Counts I through VIII in the complaint is **GRANTED**. Counts IX through XI are **DISMISSED** for lack of subject matter jurisdiction. Mr. Halim's motion for summary judgment is **DENIED**.

## BACKGROUND

### I.   Procedural Background

As noted above, Mr. Halim's claims in this case relate to his interests in five apartment complexes that HUD offered for purchase at foreclosure sales. Mr. Halim purchased four of the properties. These are the Schenectady 40 complex in New York, the Meadowbrook apartment complex in Mississippi, the Beacon Light Apartments in North Carolina, and the Highland Village Apartments in Alabama. Each of these properties was in a significant state of disrepair at the time of purchase, and required substantial repairs to meet the obligations imposed by the foreclosure sales and HAP contracts Mr. Halim entered with HUD. As noted above, the legal disputes in this action concern the extent to which Mr. Halim met those obligations and, with respect to two of the properties, whether he was excused from meeting them by the doctrines of impossibility or mutual mistake of fact.

The fifth property is the Nichols Townhomes project in Ohio. Mr. Halim was the high bidder for the Nichols Townhomes, but HUD determined that Mr. Halim did not establish his qualifications to self-manage that property. When Mr. Halim failed to retain an independent property management firm as HUD had directed, the agency cancelled the sale and retained his earnest money.

Mr. Halim initiated this lawsuit on November 8, 2010, by filing a complaint against HUD in the United States District Court for the District of Columbia. In that complaint, he alleged breaches of the foreclosure sales and/or HAP contracts that covered the Schenectady 40 apartments, the Nichols Townhomes, and the Beacon Light Apartments. Compl. for Breach of Contract ¶¶ 4–21, ECF No. 1-1. Because he requested over $1.5 million dollars in damages for those alleged breaches, the district court transferred the case to this court on October 11, 2011. Order, ECF No. 1-1 (citing 28 U.S.C. § 1346(a) (Tucker Act provision giving the Court of Federal Claims exclusive jurisdiction over contract claims against the United States that seek more than $10,000 in damages)).

Mr. Halim filed a transfer complaint in this Court on February 8, 2012. Am. Compl. for Breach of Contract, ECF No. 5. In that complaint, he again alleged breaches of contract related

to the Schenectady 40 apartments, Nichols Townhomes, and the Beacon Light property. Id. ¶¶ 4–21. A few months later, on May 30, 2012, Mr. Halim filed an amended complaint, which added allegations of breach of contract related to the Meadowbrook apartment complex. 3d Am. Compl. for Breach of Contract ¶¶ 28–33, ECF No. 9; see also Order, ECF No. 10.

In the meantime, two months earlier, on March 9, 2012, Mr. Halim had filed a related pro se complaint in the United States District Court for the District of Columbia. See Halim v. United States, 106 Fed. Cl. 677, 680 (2012) (citing Compl., Halim v. Donovan, No. 12-384 (D.D.C. Mar. 9, 2012)); see also Halim v. Donovan, No. 12-384, 2013 WL 595891, at *1 (D.D.C. Feb. 15, 2013). In that action, he alleged that the Secretary of HUD as well as the city council, city manager, and mayor of Henderson, North Carolina had discriminated against him based on national origin and in violation of the Civil Rights Act of 1964, in connection with certain transactions related to the Nichols Townhomes, Beacon Light, and Schenectady 40. Halim, 106 Fed. Cl. at 683; see also Mot. to Dismiss, App. at A11–15, ECF No. 13-1.

On September 24, 2012, Chief Judge Emily Hewitt (who was then presiding over the present case) denied the government's motion to dismiss for lack of subject matter jurisdiction but entered a stay of proceedings pending a decision in the discrimination case. Halim, 106 Fed. Cl. at 688–89. The district court dismissed Mr. Halim's suit on July 1, 2013. See Halim v. Donovan, 951 F. Supp. 2d 201 (D.D.C. 2013). Judge Thomas C. Wheeler, who was presiding over the case after reassignment on June 26, 2013 (ECF Nos. 19, 20), lifted the stay on September 5, 2013. Order Lifting Stay, Docket Entry on September 5, 2013.

Thereafter, on November 25, 2013, the case was transferred to the undersigned. ECF No. 28. On March 24, 2014, Mr. Halim moved to substitute new counsel, and the Court granted that motion. ECF Nos. 30, 31. On January 9, 2015, Mr. Halim filed another amended complaint, which is the current operative pleading and which added claims related to a fifth property, the Highland Village Apartments. 4th Am. Compl., ECF No. 38.

## II.    The Claims Before the Court

In Count I of the current operative pleading, Mr. Halim alleges that HUD breached the Schenectady 40 Foreclosure Sale Use Agreement by failing to return his repair escrow. Id. ¶ 64. In Count II he alleges that HUD breached the Schenectady 40 HAP Contract by terminating it "on the erroneous basis that Plaintiff failed to maintain the [] Project in accordance with HUD's UPCS." Id. ¶ 68. Mr. Halim makes similar allegations with respect to the Meadowbrook Foreclosure Sale Use Agreement and HAP Contract in Counts III and IV. Id. ¶¶ 70–78. In Count V, Mr. Halim alleges that HUD breached the Nichols Townhomes sales agreement by cancelling the sale "on the erroneous basis that Plaintiff was not qualified to manage the [] Project." Id. ¶ 82.

Counts VI, VII, and VIII all relate to Mr. Halim's purchase of the Beacon Light Apartments in North Carolina. Id. ¶¶ 84–101. In Count VI, Mr. Halim seeks rescission of the Foreclosure Sale Use Agreement based on what he alleges was a mutual mistake of fact regarding whether the repairs required under the contract could be performed. Id. ¶ 84–88. Count VII alleges breach of an oral contract for the transfer of the Beacon Light property back to HUD. Id. ¶ 89–94. And in Count VIII, Mr. Halim alleges that HUD breached the Foreclosure Sale Use

Agreement when it gave his escrow funds to the City of Henderson to fund the demolition of the apartment complex. Id. ¶¶ 84–101.

Finally, Counts IX, X, and XI concern the Highland Village complex. Id. ¶¶ 102–118. In these Counts, Mr. Halim seeks rescission of the Foreclosure Sale Use Agreement on alternative grounds which include misrepresentation of fact by HUD, a unilateral mistake of fact by Mr. Halim, and mutual mistake of fact by the parties. Id.

## III.    The Cross-Motions Before the Court

On February 17, 2017, the government moved for summary judgment as to all eleven counts in the fourth amended complaint. Def.'s Mot. for Summ. J. ("Def.'s Mot.") at 1, ECF No. 60. As to Counts I through VIII, the government contends that the material facts are not in dispute and that it is entitled to judgment as a matter of law. Id. at 7–8. With respect to Counts IX, X, and XI, the government contends that Mr. Halim's claims are barred by the Tucker Act's six-year statute of limitations, and should accordingly be dismissed. Id. at 9.

Mr. Halim opposes the government's motion for summary judgment as to Counts I, II, and IV on the grounds that there is a genuine dispute of material fact regarding the condition and repair status of the Schenectady 40 and Meadowbrook properties. See Pl.'s Opp'n to Def.'s Mot. for Summ. J. & Cross-Mot. for Summ. J. ("Pl.'s Mot.") at 5–6, ECF No. 73. He has cross-moved for summary judgment as to Count III, relating to the Foreclosure Sale Use Agreement at the Meadowbrook apartments. Id. at 26–28. He claims that he was relieved from his contractual obligations by the doctrine of impossibility and seeks return of his escrow money on that basis. He has also moved for summary judgment as to Counts V–VIII. Id. at 7–24.

Finally, because Mr. Halim and his attorney were not in agreement regarding the pursuit of Counts IX, X, and XI (see Pl.'s Unopposed Mot. for an Extension of Time, ECF No. 74), the Court gave Mr. Halim permission to file a response and cross-motion for summary judgment on those counts pro se. See Order, ECF No. 75; Pl.'s Opp'n to Def.'s Mot. for Summ. J. & Cross-Mot. for Summ. J. on Counts IX, X and XI of the Compl. ("Pl.'s Mot. IX–XI"), ECF No. 80.

The Court held oral argument on the cross-motions on October 16, 2018.

## DISCUSSION

## I.    Summary Judgment Standards

In accordance with Rule 56(a) of the Rules of the Court of Federal Claims ("RCFC"), the court may grant summary judgment to a party "if the movant shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In ruling on a motion for summary judgment, all evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970).

"Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence." Crown Operations Int'l, Ltd. v. Solutia Inc., 289 F.3d 1367, 1375 (Fed. Cir. 2002) (citing Anderson, 477 U.S. at 248); see also Dairyland Power Co-op. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing Celotex, 477 U.S. at 325) (observing that the moving party "may discharge its burden by showing the court that there is an absence of evidence to support the nonmoving party's case"). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248 (1986). An issue of material fact is in genuine dispute if it "may reasonably be resolved in favor of either party." Id. at 250.

## II.   Motion for Summary Judgment as to Count V: Nichols Townhomes

### A.   Material Facts Not In Dispute

The Nichols Townhomes is a twenty-four-unit apartment complex in Flushing, Ohio. Def.'s Mot., App. at A1. HUD held a foreclosure sale for the property on May 12, 2006. Id.

Pursuant to Section 1 of the bid kit provided to prospective purchasers at the foreclosure sale, HUD reserved the right to reject the bid of any prospective purchaser whom HUD determined "lacks the experience, ability or financial responsibility needed to own and manage the project." Id. at A3. To facilitate HUD's consideration of the purchaser's qualifications, the successful bidder was required to complete and submit certain forms within ten days of the foreclosure sale. See id. at A4–5. The forms included, among others, the Bidder's Property Management Statement; HUD Forms 9832 and 9839 (Management Entity Profile and Management Certification); and HUD Form 935.2 (the Affirmative Fair Marketing Plan). Id.

As pertinent to Mr. Halim's claims regarding the Nichols Townhomes, the bid documents stated that "[i]f HUD determines that the Bidder/Owner entity is unqualified to self-manage the Project, HUD may require the Bidder/Owner entity to obtain the services of a qualified property management firm." Id. at A13. In those circumstances, "[t]he Bidder/Owner entity must then provide HUD with evidence that a qualified property management firm has been retained prior to Closing." Id. The bid documents warned that "[i]f [the] Bidder/Owner entity does not meet this obligation, HUD may reject the bid and retain the Bidder's earnest money deposit." Id.; see also id. at A123 (Attachment B – "Terms and Requirements of Foreclosure Sale").

At the foreclosure sale for the Nichols Townhomes, Mr. Halim was the high bidder with an offer of $266,000. Id. at A113, A128. HUD accepted his bid and deposited the $50,000 earnest money check Mr. Halim had supplied. Id. at A114.

Pursuant to the terms of Rider 1 of the Foreclosure Sale Use Agreement for the Nichols Townhomes, Mr. Halim was required to complete and submit HUD forms to "demonstrate [his] ability to meet HUD requirements for purchase of the Project" by May 26, 2006. Id. at A123, A129. Further, consistent with the warnings in the bid documents, the Rider provided that "[i]f HUD determines that the Bidder/Owner entity is unqualified to self-manage the Project, HUD may require the Bidder/Owner entity to obtain the services of a qualified property management firm." Id. at A123. If Mr. Halim failed to retain those services, the Rider provided, "HUD may reject the bid and retain the Bidder's earnest money deposit." Id.

On June 9, 2006, Ruth Pompa, Chief of the Sales Team at HUD's Fort Worth Multifamily Property Disposition Center, informed Mr. Halim that his Form 935.2 (the Affirmative Fair Marketing Plan), his Form 9832 (the Management Entity Profile), his Form 9839-A (the Project Owner's Certification for Owner-Managed Multifamily Housing Projects), and his Bidder's Property Management Statement were "incomplete or . . . in need of correction/clarification." Id. at A148. Specifically, she noted that on Mr. Halim's "Management Entity Profile" form, he had failed to "identify any professional memberships, licenses, certificates or accreditations which are related to property management activities." Id. at A148; see also id. at A136 ("Management Entity Profile"). Ms. Pompa advised that "[t]his indicates that there are no Certified Property Managers within [his] management company." Id. at A148. She also pointed out that Mr. Halim did not identify "any manuals or guides for staff" on the part of the form designed to inform HUD what "management procedures or operating manuals are used by on-site or supervisory staff." Id. In addition, Ms. Pompa advised Mr. Halim that his "Bidder's Property Management Statement [id. at A140] indicate[d] that [he was] proposing to self-manage the property" but that it did "not indicate any previous experience in Project Based Section 8 housing." Id. at A149.

Ms. Pompa notified Mr. Halim that "[b]ased upon [his] submission" HUD had determined that he had not proven that either he or his management company had "the experience required to manage the property." Id. In accordance with the terms of the bid documents and Rider 1 of the Foreclosure Sale Use Agreement, Ms. Pompa advised Mr. Halim, he "should immediately retain a property management firm and have them complete the required forms . . . no later than June 19, 2006." Id. She warned Mr. Halim that if he did not do so, "HUD may reject [his] bid and retain the Earnest Money Deposit." Id.

Notwithstanding this admonition, Mr. Halim did not retain a property management firm. Therefore, instead of having an independent firm complete the required forms, Mr. Halim submitted revised forms on his own behalf in late June 2006. See id. at A151–73; id. at A174.

Ms. Pompa found Mr. Halim's submission inadequate for three reasons. First, she observed that "[e]ven though our letter of June 9, 2006, specifically instructed you to obtain professional management, you still propose to self-manage." Id. at A174. Second, she concluded that the management documents Mr. Halim had submitted were still flawed. Id. In particular, she determined that "[t]he Statement of the services, maintenance and utilities does not comply with the services identified in the bid kit, specifically, Exhibit B of the HAP Contract." Id. In addition, she advised Mr. Halim, "pages 3 and 4 of the Management Certification form are missing." Id. Finally, Ms. Pompa stated that "[t]he revised Affirmative Fair Housing Marketing Plan is still not completed properly" as "[the] responses are too general and must contain full and complete responses as required by the form." Id.

Ms. Pompa concluded that Mr. Halim did "not have the experience necessary to self-manage a Project-based Section 8 property based on [his] inability to complete the required HUD management forms according to printed instructions." Id. Because Mr. Halim had failed to "provide[] evidence that a qualified property management firm ha[d] been retained," HUD rejected his bid and retained his earnest money. Id.

**B. Merits of Motions for Summary Judgment as to Nichols Townhomes**

In Count V of his complaint, Mr. Halim seeks the return of his $50,000 earnest money deposit. 4th Am. Compl. ¶ 83. He claims that HUD breached the foreclosure sale contract when it cancelled the sale based on what he claims was an "erroneous conclusion" that he lacked the qualifications to manage the Nichols Townhomes project. Id. ¶ 82.

The government has moved for summary judgment as to Count V. It contends that the undisputed facts demonstrate that Mr. Halim failed to hire an independent firm to manage the property, as HUD had directed. Def.'s Mot. at 13–14. Therefore, according to the government, HUD's cancellation of the sale and its decision to retain Mr. Halim's earnest money deposit were consistent with the terms of the sales agreement and the bid documents. Id.

Mr. Halim, in response, does not dispute that HUD had the discretion to determine whether or not he was qualified to self-manage the Nichols Townhomes project. Pl.'s Mot. at 22–23. He also does not deny that HUD had the discretion to retain his earnest money deposit if he declined to hire an independent management firm after being directed to do so. See id. He argues, however, that there exists a genuine issue of material fact as to whether HUD acted in bad faith in making those determinations. Id. Specifically, he contends: 1) that HUD had approved him to self-manage eight other projects, five before and three after he submitted his bid on Nichols Townhomes; and 2) that the "Management Entity Profile" and "Management Certification" he submitted as to those properties were "essentially the same" as the forms he submitted for the Nichols Townhomes project. Id. at 23 (citing Decl. of Ahmed Halim ¶¶ 19–20, ECF 73-2).

Mr. Halim has failed to introduce evidence sufficient to create a triable issue as to whether or not HUD acted in good faith when it cancelled the sale and retained his earnest money. The Federal Circuit and its predecessor court "have long upheld the principle that government officials are presumed to discharge their duties in good faith." Rd. & Highway Builders, LLC v. United States, 702 F.3d 1365, 1368 (Fed. Cir. 2012) (citing Am–Pro Protective Agency v. United States, 281 F.3d 1234, 1239 (Fed. Cir. 2002); T & M Distribs., Inc. v. United States, 185 F.3d 1279, 1285 (Fed. Cir. 1999); Torncello v. United States, 681 F.2d 756, 770–71 (Ct. Cl. 1982); Schaefer v. United States, 633 F.2d 945, 948–49 (Ct. Cl. 1980); Kalvar Corp. v. United States, 543 F.2d 1298 (Ct. Cl. 1976); Librach v. United States, 147 Ct. Cl. 605, 614 (1959); Knotts v. United States,121 F. Supp. 630, 631 (Ct. Cl. 1954)). Further, the court of appeals has held that "'a high burden must be carried to overcome this presumption,' amounting to clear and convincing evidence to the contrary." Id. (quoting Am-Pro, 281 F.3d at 1239–40).

As noted above, "[a] nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law." Dairyland Power Co-op, 16 F.3d at 1202. In this case, Mr. Halim has fallen far short of providing proof that would enable a reasonable factfinder to conclude, based on preponderant—much less clear and convincing—evidence that HUD acted in bad faith when it found him unqualified to self-manage the Nichols Townhomes.

First, Mr. Halim's assertion that HUD approved his qualifications for other projects where he submitted "Management Entity Profile" and "Management Certification" forms that were "essentially the same" as those he submitted in connection with Nichols Townhomes is merely a bald assertion. Mr. Halim did not submit the forms into evidence so that the Court might determine whether or not they were, in fact, "essentially the same." Without the forms to review as a point of comparison, Mr. Halim's assertions that they were "essentially the same" are, at best, an expression of his opinion, not a fact.

Further, even assuming that the forms submitted in the other transactions were "essentially the same" as those submitted here, Mr. Halim has provided no evidence that would show that the contexts in which those forms were considered were comparable. The other foreclosure sales involved different properties and determinations made by other individuals and regional offices. For all the Court can tell, those decision-makers might have had before them other information which compensated for the deficiencies in the two forms which Mr. Halim alleges were "essentially the same" as those submitted in connection with the Nichols Townhomes project.

In any event, and perhaps most importantly, "[a] challenger seeking to prove that a government official acted in bad faith in the discharge of his or her duties must show a 'specific intent to injure the plaintiff' by clear and convincing evidence." Id. (quoting Am-Pro, 281 F.3d at 1240). In this case, Mr. Halim appears to be suggesting that HUD officials fabricated excuses to cancel the sale notwithstanding that he was the high bidder on the Nichols Townhomes. But he has not provided any evidence that the HUD officials considering his qualifications to purchase the Nichols Townhomes harbored any animus at all toward him, much less that they acted on such animus. See Am-Pro, 281 F.3d at 1241 (granting summary judgment as to allegation of bad faith where nothing in the plaintiff's affidavit suggested that the government had a specific intent to injure plaintiff or that its decisions were motivated by animus).

In short, the undisputed evidence shows that HUD's decision to withhold Mr. Halim's escrow money was entirely consistent with the foreclosure sale agreement and the bid documents. HUD determined that the forms Mr. Halim submitted did not establish his qualifications to self-manage the Nichols Townhomes. Mr. Halim then failed to take advantage of the opportunity HUD gave him to complete the sale by hiring an independent property management firm. The government is, accordingly, entitled to summary judgment as to Count V of the complaint.

## III.   Motion for Summary Judgment as to Counts I and II (Schenectady 40 Apartments)

### A.   Material Facts as to Which There Is No Genuine Dispute

#### 1.   Mr. Halim's Purchase of the Complex and His Agreements with HUD

The Schenectady 40 property is an apartment complex located in Schenectady, New York. Def.'s Mot., App. at A175. HUD held a foreclosure sale for the property on May 31, 2006. Id. Section 1 of the bid kit stated, under a heading in bold font entitled "Post-Closing Required Repairs," that "[r]epair requirements that must be completed after closing . . . are included in the Form HUD-9552, Post-Closing Repair Requirements, and Exhibits, Attachment E, to this

Invitation." Id. at A177. It further provided that "[t]he repair requirements listed in Attachment E survive the sale and will be recorded with the Deed." Id. The bid kit also notified prospective purchasers that they would be required to provide a letter of credit in the amount of $403,584 to cover the cost of the required repairs, which was $1,614,336. Id. at A180–82. In addition, it required that the repairs be completed "to HUD's satisfaction within 24 months after closing." Id. at A182.

Mr. Halim, the high bidder on Schenectady 40, entered a Foreclosure Sale Use Agreement with HUD on July 25, 2006. Id. at A188. Rider 1 to the agreement required Mr. Halim to maintain the property as affordable rental housing for a period of twenty years. Id. at A195. The agreement included a number of provisions governing Mr. Halim's obligations to make necessary repairs to the property and to maintain its physical condition consistent with HUD standards.

Under the caption "Subject to Examination," the agreement stated that "[t]he Project shall at all times . . . be maintained in decent, safe and sanitary condition to the greatest extent possible." Id. at A188. Rider 2 to the agreement is entitled "Post-Closing Repair Escrow Requirements." Id. at A196. In Rider 2, Mr. Halim "covenant[ed] to complete required repairs within twenty-four (24) months of Closing." Id. Rider 2 also provided that "[t]o ensure completion, the Purchaser shall provide to HUD . . . an unconditional, irrevocable and non-documentary Letter of Credit" with an expiration date no sooner than six months past the deadline for completion of repairs. Id. It continued that "HUD may cash the LOC and apply the funds to correct latent defects in the completed repairs if the Purchaser is unable or unwilling to make such repairs within the six month period, or for such purposes as HUD deems appropriate." Id.

Rider 7 concerned entitlement to Section 8 housing assistance payments. Id. at A201.[1] As a condition of receiving such payments, Mr. Halim agreed to "rehabilitate/repair the property to make the project units decent, safe and sanitary as defined by HUD and to complete the work in accordance with the HUD approved work write up and cost estimates." Id. More specifically, he

---

[1] As the court of appeals explained in Haddon Hous. Assocs., Ltd. P'ship v. United States, 711 F.3d 1330, 1332–33 (Fed. Cir. 2013):

Section 8 of the Housing Act created a housing assistance program through which HUD subsidizes the rents of low-income individuals and families living in privately-owned homes and apartments. See 42 U.S.C. § 1437f. Building owners enter into HAP Contracts that obligate HUD to pay rent subsidies on behalf of low-income occupants. Id. Each HAP Contract establishes the maximum monthly rent, otherwise known as the "contract rent," that a building owner is entitled to receive for a particular housing unit. 42 U.S.C. § 1437f(c)(1); 24 C.F.R. § 880.201. The tenants are obligated to pay a portion of the established monthly rent based on particular income guidelines, see 42 U.S.C. § 1437a, while the government pays a subsidy to the building owner to bridge the difference between the tenant obligation and contract rent. See 42 U.S.C. § 1437f.

agreed that he would begin rehabilitation within fourteen days after closing and that all contract units would be brought into compliance with HUD's UPCS within 180 days. Id.[2]

Rider 7 also reiterated Mr. Halim's obligation to complete the repairs specified in Attachment E (id. at A207–11) within twenty-four months, and stated that "[i]n the event the work is not commenced, diligently continued, or completed as required under this Rider, HUD reserves the right to rescind the sale or take other appropriate action it determines acceptable and within its authority." Id. This Rider also provided that "[a]ny default" under the aforementioned provisions would also "constitute[] a default under the Housing Assistance Payments (HAP) Contract" that the parties simultaneously entered. Id. at A202.

The Foreclosure Sale Use Agreement contained a clause setting forth "remedies for noncompliance." Id. at A188. It stated that "upon any violation of any provision of this Agreement" HUD could give notice of the violation to the purchaser, who would then have either thirty days or such further time as the Secretary identified, to correct the violation "to the satisfaction of the Secretary." Id. at A188–89. If the violation was not corrected, then HUD could declare a default under the agreement, and seek appropriate remedies. Id.

Finally, in the HAP Contract, Mr. Halim agreed that he would "at all times during the term of the . . . contract" ensure that "[a]ll contract units . . . are in good and tenantable condition, and in accordance with the UPCS." Id. at A225. Similarly, the HAP Contract required Mr. Halim to "maintain and operate the contract units and premises to provide decent, safe and sanitary housing in accordance with the UPCS." Id. at A226. HUD was authorized to inspect the contract units and the premises on an annual basis, "and at any time [HUD] deems necessary to assure that the contract units and premises are in accordance with the UPCS." Id. If HUD "determine[d] that a contract unit [was] not in accordance with the UPCS, [it could] exercise any of its remedies under the HAP contract for all or any contract units." Id. Those remedies included "termination, suspension or reduction of housing assistance payments, and termination of the HAP contract." Id.; see also id. at A228 (providing that an owner's failure "to comply with any obligation under the HAP contract, including the owner's obligations to maintain the units in accordance with the UPCS" is considered a default by the owner).

## 2. HUD's Inspections of Schenectady 40 and Its Determinations of Noncompliance

HUD contracted with Applied Engineering Solutions, Inc. (hereinafter "the HUD inspector") to perform both the post-closing repair and UPCS inspections for the Schenectady 40 complex. The first UPCS inspections took place in August and November 2006. Id. at A242. Six

---

[2] By regulation, purchasers of property at HUD foreclosure sales must ensure that the property remains in compliance with the "physical condition standards for HUD housing that is decent, safe, sanitary and in good repair" which are set forth at 24 C.F.R. § 5.703. The property must be inspected at least annually to determine compliance with the standards and the inspections must be conducted "in accordance with HUD-prescribed physical inspection procedures." 24 C.F.R. § 5.705.

of the thirty-three apartments inspected in August failed the inspection. Id. at A243. Those six apartments (as well as an additional five) failed inspection in November. Id.

The next month, in December, the HUD inspector conducted a post-closing inspection to determine Mr. Halim's progress on the completion of the repairs specified in the closing documents. Id. at A257. He noted that "[t]he majority of the work accomplished was only as necessary for the units to pass the UPCS." Id. at A258. He further observed that "[n]o major modernization program has been attempted" and that "[c]onsiderable work" was "still necessary to meet the Post-Closing requirements." Id.

HUD determined that Mr. Halim had completed 21% of the required repairs on the basis of the December report. Id. at A268. Therefore, HUD released $86,144 from the letter of credit repair escrow to Mr. Halim in January 2007. Id.

On March 13, 2008, approximately four months before the expiration of the twenty-four-month contract repair deadline, the HUD inspector conducted both a UPCS and post-closing inspection. Id. at A271–89.[3] The inspector checked the two apartments that had failed the prior UPCS inspections. Id. at A272. He concluded that they met the standards, but that "the work was of questionable quality" and he "instructed [Mr. Halim's new management agent] to complete some of the flooring and painting with better workmanship prior to leasing the units." Id.

As to the post-closing portion of the inspection, the HUD inspector again found that the "majority of the work accomplished to date . . . was only as necessary for the units to pass the UPCS inspection." Id. at A276. He also again noted that "[n]o major modernization program ha[d] been attempted" and that "[c]onsiderable work . . . [was] still necessary to meet the Post-Closing requirements." Id. The HUD inspector also recorded that Mr. Halim reported replacing certain roofs and completing "handicap modifications," but that the roofs had in fact only been "patched at best" and that "extensive work [was] required" on the handicap units "to meet the requirements of the Uniform Federal Accessibility Standards." Id.

### 3. HUD Notice of Breach

In November 2008, HUD sent Mr. Halim "official notice that [he was] in breach of the Foreclosure Sale Use Agreement," because the required post-closing repairs had not been completed within two years of closing. Id. at A290. HUD determined that only 32% of the required repairs had been completed as of the March 2008 inspection. Id. It noted that its inspector had contacted Mr. Halim on numerous occasions after March 2008 to schedule follow-up inspections, but that Mr. Halim had not agreed to a date and time. Id.

In its November 2008 notice, HUD gave Mr. Halim ten days to submit a schedule for the "satisfactory completion" of all repairs within the next twelve months. Id. HUD cautioned Mr. Halim that if it did "not receive a response and/or a schedule acceptable to the Department . . . [it

---

[3] The cover letter for this UPCS inspection which is dated March 14, 2008, id. at A272, incorrectly identifies the inspection date as December 13, 2008. The attached inspection report is dated March 13, 2008.

would] take appropriate legal action, including, but not limited to, retaining the $400,000 cash held in escrow by HUD to ensure acceptable completion of the repairs." Id.

Mr. Halim appears to have responded to this notification by offering to schedule a follow-up inspection. See id. at A291. That inspection took place over two days, on March 31 and April 1, 2009. Id. at A292. On this occasion, only one of the forty apartments passed the UPCS inspection. Id. at A293. Among other things, stairs and walls were damaged, smoke detectors were missing, and doors were improperly secured or not latching. Id. at A293–94.

With respect to whether Mr. Halim had completed the required post-closing repairs, the inspector wrote that "it does not appear that any substantial improvements have been made since the time of . . . last inspection over a year ago." Id. at A390. He further observed that "[t]he condition of many of the apartments and common spaces has deteriorated with many being damaged by vandals and water infiltration" and that "[m]ultiple apartments will remain uninhabitable without significant expenditures." Id. "Because of the additional deterioration," the inspector stated, "the amount of funds indicated in the attached Cost Estimate and HUD Form 9552 will in no way be sufficient to accomplish the needed repairs." Id.

Approximately two months after the preparation of this report, on June 22, 2009, HUD sent Mr. Halim a notice of default, advising him that he was "in violation of the Housing Assistance Payments Contract." Id. at A406. It stated that he was not "maintain[ing the property] in accordance with the terms of the Use Agreement and/or the HAP Contract." Id. HUD directed Mr. Halim to take corrective action, including correcting all deficiencies, within thirty days. Id.

HUD's inspector then conducted another follow-up inspection on August 11, 2009. Id. at A408. This time, all forty apartments failed the UPCS portion of the inspection. Id. at A409. With respect to the required post-closing repairs, the inspector noted that the plumbing had been replaced in the vandalized units, drywall repairs were in progress in all but two of those units, and "[s]ignificant upgrades had been accomplished in six apartments other than those vandalized." Id. A504. Nevertheless, he noted that "more repairs [were] needed in those apartments to meet the Post-Closing Requirements." Id. He described what he called "[s]elective work" that had been undertaken without a formal modernization program and characterized the repairs as "random in nature with no logical order." Id. The inspector also reported that Mr. Halim was "continu[ing] to patch components and finishes such as roofs, cabinets, floors, etc. in lieu of replacing them as needed." Id. at A504–05.

On October 6, 2009, HUD advised Mr. Halim that it was abating the HAP Contract because the August 11, 2009 inspection found that the violations referenced in its June 22, 2009 notice of default "ha[d] not been corrected." Id. at A520. HUD subsequently sent Mr. Halim a formal "Notice of Abatement of Housing Assistance Payments and Termination of Section 8 Housing Assistance Payment Contract" dated October 30, 2009. Id. at A521. In that second letter, HUD wrote that "[d]ue to your continued failure to maintain the subject property in accordance with the Owner Certification section of the HAP Contract, you are hereby notified that [HUD] will be abating HAP payments," and that once all eligible tenants were relocated, "the HAP contract [would] be terminated." Id. at A521–22.

On July 7, 2010, HUD released $68,584 to Mr. Halim from the repair escrow. It based the release of the funds on its inspector's last report, which had concluded that 38% of required repairs had been completed. Id. at A523. HUD thus retained $248,856. See id.

## B. Merits of Motions for Summary Judgment as to Schenectady 40

### 1. Count I—Failure to Timely Complete Repairs

Because the parties closed on the sale of Schenectady 40 on July 25, 2006, Mr. Halim was required to complete repairs on the property by July 24, 2008. See id. at A189, A196. He was formally advised on June 22, 2009 to take corrective action within thirty days. The record is undisputed, however, that as of at least August 11, 2009, the repairs had not been completed. The government has therefore moved for summary judgment as to Count I, which seeks damages for HUD's retention of the remaining $248,856 in the repair escrow account.

Mr. Halim opposes the government's motion for summary judgment. Pl.'s Mot. at 31. He claims that there exists a genuine dispute of material fact with respect to whether all repairs had been completed as of October 2009. Id. at 33–36. To support the existence of such a dispute, he cites an assertion in his own affidavit that he "completed all of the required repairs by October 2009." Pl.'s Mot., Decl. of Ahmed Halim ¶ 30.

The assertion in Mr. Halim's affidavit that he completed the repairs by October 2009 is insufficient to defeat the government's motion for summary judgment because it is conclusory and uncorroborated by any supporting documentation. See Barmag Barmer Maschinenfabrik AG v. United States, 731 F.2d 831, 836 (Fed. Cir. 1984) (party opposing summary judgment must show evidentiary conflict in the record and cannot rely upon mere denials or conclusory statements). But even were the Court to credit Mr. Halim's bald assertion, it does not create a genuine dispute of material fact because Mr. Halim was contractually obligated to complete the repairs by July 2008. See Anderson, 477 U.S. at 248 (defining material facts as those "that might affect the outcome of the suit under the governing law"). That deadline was never extended.

In short, the material facts are not in dispute. HUD was within its rights to retain the funds from Mr. Halim's letter of credit escrow account because it is undisputed that he did not timely complete the repairs. The government is therefore entitled to summary judgment as to Count I.

### 2. Count II—Failure to Ensure Continuous Compliance with UPCS

As described above, the HAP Contract contains an owner certification which states that "[t]he owner certifies that at all times during the term of the HAP contract [a]ll contract units . . . are in good and tenantable condition, and in accordance with the UPCS." Def.'s Mot., App. at A225. If any unit was "not in accordance with the UPCS," HUD could "exercise any of its remedies . . . for all or any contract units," which included "termination of the HAP contract." Id. at A226. If Mr. Halim defaulted in this regard, HUD was required to notify him in writing and could require him to take action by a certain date prior to exercising its right to terminate the contract. Id. at A229.

As explained above, after the HUD inspector determined on March 31 and April 1, 2009 that thirty-nine of the forty apartments failed UPCS inspection, HUD informed Mr. Halim in June 2009 that he was in violation of the HAP Contract. Id. at A406. It directed him to take corrective action within thirty days. Id. When HUD's inspector returned in August 2009, however, all forty apartments failed the UPCS inspection. Id. at A408–09. There is no dispute in the record as to this fact. HUD then abated the HAP Contract by letter of October 6, 2009. Id. at A520.

In opposing the government's motion for summary judgment as to Count II, Mr. Halim again contends that there is a genuine dispute of material fact, this time with respect to whether he was in compliance with the UPCS standards during the operative time period. Pl.'s Mot. at 35. He relies upon a letter from the City of Schenectady's Bureau of Code Enforcement dated October 9, 2009. Pl.'s Mot, App. at A–9, ECF No. 73-1. The letter, which bears the signature of Elisa B. Wickham, the city's code enforcement coordinator, is addressed "[t]o [w]hom [i]t [m]ay [c]oncern." Id. In it, Ms. Wickham stated that the purpose of the letter was "to inform you that the . . . referenced properties have no outstanding violations and have a rental inspection certificate for all tenants living there." Id. Further, Ms. Wickham stated that "all permits have been obtained for any and all work or violations if any, all complaints have been addressed within 48 hours and every property has passed inspections." Id.

The letter from Ms. Wickham does not create a dispute as to any material fact at issue with respect to Count II of the complaint. The HUD inspector's determination that all forty apartments were out of compliance with the UPCS as of August 2009 is unrebutted. Even crediting as accurate the observations in the letter regarding compliance with municipal requirements, such observations do not bear on whether the apartments were also in compliance with the UPCS, which are HUD-administered standards. And HUD's regulations, as well as the contracts at issue, make it clear that property owners must meet both its physical condition standards and the standards set forth in state and local codes. See 24 C.F.R. § 5.703(g) (stating that "[t]he physical condition standards in this section do not supersede or preempt State and local codes for building and maintenance with which HUD housing must comply" and that HUD housing must continue to adhere to these codes). Further, the date of Ms. Wickham's letter is October 9, 2009, which is well after the thirty-day deadline HUD gave Mr. Halim in its June 22, 2009 notice of default and almost two months after the August inspection by the HUD inspector which found that none of the forty apartments were in compliance with the UPCS.

In short, the facts are not in dispute as to Mr. Halim's noncompliance with the UPCS as of the final deadline set by HUD—which was July 22, 2009. Under the contract, HUD was entitled to terminate the housing assistance payments after the thirty-day notice period expired. HUD's termination of the HAP Contract was not a breach of contract. The government is therefore entitled to summary judgment as to Count II.

## IV.   Motion for Summary Judgment as to Counts III and IV (Meadowbrook)

### A.   Material Facts as to Which There Is No Genuine Dispute

#### 1.   Contract Provisions

Meadowbrook Apartments is a fifty-one-unit apartment complex located in Meridian, Mississippi. Def.'s Mot., App. at A529, A536. It consists of thirteen buildings. Id. at A536. HUD auctioned the property at a foreclosure sale on August 4, 2006. Id. at A529. In the bid kit, HUD estimated that the required post-closing repairs would cost $2,003,276, and required a letter of credit for those repairs in the amount of $500,819.[4] Id. at A536–37, A547. As with the Schenectady 40 property, HUD required post-closing repairs to be completed to its satisfaction "within 24 months after closing." Id. at A537.

Mr. Halim was the successful bidder on Meadowbrook and the parties closed on the sale of the property on January 19, 2007. See id. at A584; see also id. at A599–600. The closing transaction included the execution of a Foreclosure Sale Use Agreement and a HAP Contract. Id. at A584; id. at A599–600.

Rider 1 to the Foreclosure Sale Use Agreement required Mr. Halim to maintain Meadowbrook as affordable rental housing for a period of twenty years. Id. at A602. As with the Schenectady 40 HAP Contract, the Meadowbrook HAP Contract required Mr. Halim to keep all units for which he would receive housing assistance payments in "good and tenantable condition" and in compliance with the UPCS requirements "at all times" during the term of the contract. Id. at A588. It also provided, as had the Schenectady 40 contract, that if the contracting authority "determines that a contract unit is not in accordance with the UPCS, the [contracting authority] may exercise any of its remedies under the HAP Contract for all or any contract units," including "termination, suspension or reduction of housing assistance payments, and termination of the HAP contract." Id. at A589.

Similarly, the Foreclosure Sale Use Agreement required the Meadowbrook project to "be maintained in decent, safe and sanitary condition . . . at all times" and required Mr. Halim "to complete the required repairs within twenty-four (24) months of Closing." Id. at A599, A603. The use agreement also included the same Rider 2 covering the post-closing repair and letter of credit requirements as discussed above with respect to Schenectady 40. See id. at A603.

Rider 6 to the Meadowbrook use agreement provided that "[i]n the event" the required repair work was "not commenced, diligently continued, or completed as required . . . HUD reserve[d] the right to rescind the sale or take other appropriate action it determine[d] acceptable and within its authority." Id. at A607. And the Foreclosure Sale Use Agreement stated that "upon any violation of any provision of this Agreement" HUD may give notice of the violation to the purchaser, who would then have either thirty days or such further time as the Secretary identified to correct the violation "to the satisfaction of the Secretary." Id. at A599. If the violation was not so corrected, then HUD could declare a default under the agreement, and seek appropriate remedies. Id.

## 2. Meadowbrook Fails UPCS and Post-Closing Repair Inspections

---

[4] The property was vandalized after closing, necessitating additional repairs; as a result, HUD ultimately required a letter of credit in the amount of $513,967.56. Def.'s Mot., App. at A581.

As it did with Schenectady 40, HUD retained Applied Engineering to perform post-closing and UPCS inspections of Meadowbrook. On January 27, 2008, approximately one year after closing, the inspector performed a UPCS inspection. Id. at A612. He found that "none of the buildings were in reasonable condition with substantial work remaining to be completed to consider the buildings livable." Id. at A613. Therefore, none of the thirteen buildings passed the inspection. Id.

Approximately seven months later, on August 13, 2008, the HUD inspector conducted a combined UPCS and post-closing inspection. Id. at A629, A646. All units inspected failed the UPCS inspection. Id. at A630, A646. The inspector described the repair work that had been performed as "sporadic," noting that "[n]o wholesale organized modernization program ha[d] been attempted"; that the "floor . . . was patched with multiple different styles" and "installed over unlevel subflooring that needed to be replaced"; and that "[n]ew countertops were provided on base cabinets that will not remain serviceable." Id. at A630–31. He also described the work quality as "poor to fair at best." Id. at A646.

### 3.   HUD Serves Mr. Halim with Notices of Violation and Default Based on His Failure To Make the Post-Closing Repairs

In a February 6, 2009 letter, HUD provided Mr. Halim with a notice of violation concerning the expiration of the twenty-four month post-closing repair deadline. Id. at A677. HUD directed Mr. Halim to provide it with an "immediate" notification "as to the status of the [required] repairs." Id. It stated that "if the repairs have not been completed, [if] the inspector determines that the repairs have not been made properly or [if] the inspector is not permitted to assess the property, you shall be in default of the Agreement." Id.

In its notice of violation, HUD informed Mr. Halim that it was aware that on December 17, 2008, the City of Meridian had declared Meadowbrook unfit for habitation, and that the City had announced its intent to demolish the apartment complex if Mr. Halim did not show an "earnest intent to correct the property" to meet the minimum requirements of the City's housing code. Id. HUD directed Mr. Halim to respond within ten days of its letter, warning that if he did not, it would cash and retain his letter of credit in the amount of $513,967. Id. at A678. Although not in the record, Mr. Halim apparently responded to HUD by a letter of February 16, 2009, in which he advised HUD that he was having difficulty securing the funds he needed to perform the repairs required. See id. at A680.

On May 4, 2009, HUD sent Mr. Halim a notice of default. Id. at A679–80. Responding to Mr. Halim's February 16, 2009 letter, HUD advised that "the funding and execution of the necessary repairs are the sole responsibility of the owner." Id. at A679. It wrote that "[s]ince the necessary repairs have not been made [by] th[e] contractually agreed upon deadline," Mr. Halim was "in default of the Deed and the Use Agreement." Id. HUD further explained that "due to [Mr. Halim's] lack of significant progress, and due to the City's impending condemnation of the property, HUD is not able to grant you a time extension to complete the necessary repairs." Id. at A680. Accordingly, it "declare[d] [him] in default" and stated that it was "prepared to cash in [his] LOC." Id.

#### 4. HUD Grants Mr. Halim a One-Year Extension of Time To Complete the Post-Closing Repairs

On May 26, 2009, Mr. Halim sent a letter to HUD in which he requested a one-year extension of time to complete the post-closing repairs. Id. at A683. Mr. Halim advised that he had hired a new contractor, and provided a timeline under which the work would be completed by January 2010. Id. at A683–85.

The Chief Administrative Officer of the City of Meridian expressed his support for Mr. Halim's extension request in a June 1, 2009 email to HUD. Id. at A681–82. He stated that after a meeting with Mr. Halim and his contractor, he was "convinced that they will be able to finish" the repairs if given a twelve-month extension. Id.

Based on this endorsement and the timeline provided by Mr. Halim's contractor, on June 18, 2009, HUD extended Mr. Halim's time to complete repairs by twelve months, to January 31, 2010. Id. at A686. HUD nevertheless cautioned Mr. Halim that "[t]he approval of this 12-month extension is conditioned upon the immediate initiation of work and continual positive construction progress in an orderly and professional workmanship manner." Id. "Failure to show monthly progress [would] result in the Department's immediate cancellation of the extension." Id.

#### 5. Mr. Halim Fails To Complete the Repairs by the First Extended Deadline

Thereafter, between July and December 2009, HUD's inspector conducted monthly inspections of the Meadowbrook property. Id. at A687–A892. The inspection reports noted some progress in certain areas, but much work left to be done. See id. At no time during that period did all of the inspected units pass a UPCS inspection. See id.

On January 25, 2010, six days prior to the expiration of HUD's extended deadline, HUD's inspector returned to Meadowbrook for a final visit. See id. at A894. He noted that "[v]ery little work ha[d] been accomplished since the time of the last inspection" in December. Id. at A895. Only five of thirteen buildings were "nearing completion." Id. Those buildings on which work had not yet started were continuing to deteriorate. Id. Additionally, units that had been "virtually complete" but which were not occupied and were not being supplied with heat or air conditioning were deteriorating and had "stippled ceiling texture . . . falling loose and floor tile that is no longer properly attached." Id. Sixteen of twenty apartments inspected for UPCS purposes passed while four failed. Id. at A921. As a result of this inspection, HUD concluded that 38% of the required repairs had been completed and on January 28, 2010, it released $185,905 from Mr. Halim's letter of credit escrow amount. Id. at A941.

During a March 1, 2010 follow-up inspection, the inspector noted that little additional work had taken place since his January 2010 visit. Id. at A944. The inspector did note, however, that the four apartments that had failed inspection in January had now passed UPCS inspection. Id. at A961.

**6.  HUD Grants Mr. Halim a Second One-Year Extension of Time To Complete Post-Closing Repairs**

On March 8, 2010, Mr. Halim requested permission from HUD to demolish Building Four at Meadowbrook due to its "extremely poor structural condition." Id. at A975. HUD granted that request in an April 5, 2010 letter. Id. In that same letter, HUD extended the deadline for completion of post-closing repairs for a second additional year, to January 15, 2011. Id. It did so based on the fact that Mr. Halim had by then completed 40% of the repairs, and because the City of Meridian had agreed to grant him such an extension with respect to compliance with its housing codes. Id. at A975. HUD advised Mr. Halim that "positive progress must be made each month and all of the HUD required repairs must be completed in a professional manner within the extended timeframe." Id. In addition, it warned Mr. Halim that "no further extensions will be granted." Id.

HUD continued to conduct monthly inspections from April 2010 through December 2010. Id. at A976–69. Progress was made during this time period. Thus, on June 3, 2010, HUD released to Mr. Halim an additional $45,640 from the letter of credit escrow based upon 44% completion, leaving a balance of $282,422. Id. at A1007. Again on July 26, 2010, it released $45,187 from the escrow based on its determination that 56% of the required repairs had been completed. Id. at A1042. On September 29, 2010, HUD released another $30,279, based on completion of 59% of the required repairs. Id. at A1062. It informed Mr. Halim, however, that it would not release any more than $6,629 of the remaining $206,956 until six months after completion of all repairs. Id. In November 2010, HUD determined that 87% of the required repairs had been completed and it released that $6,629. Id. at A1137.

The HUD inspector visited Meadowbrook again on December 20, 2010 for an eighteenth post-closing inspection. Id. at A1125, A1140. At that time, the inspector noted that over the course of the past few months, twenty-four apartments had passed a UPCS inspection.[5] Id. at 1125. On December 20, however, all four units that he inspected failed. Id. In addition, the inspector reported, a number of other units were not ready for inspection because they were missing a significant number of required fixtures, such as lighting and toilets. Id. He also warned that units that had previously passed UPCS inspection should be reinspected due to the possibility of deterioration in the interim. Id. at A1126. With respect to post-closing requirements, the inspector found that repairs on eight of the property's thirteen buildings were "complete or nearly complete on the interior with exterior repairs nearing completion as well." Id. at A1140.

On January 26, 2011, HUD's inspector informed HUD that the City of Meridian had issued a stop-work order preventing Mr. Halim from continuing work at Meadowbrook because

---

[5] The inspector's report stated that "[t]o date, twenty-four of the fifty-two dwelling units have been found to meet the necessary requirements." Def.'s Mot., App. at A1125. HUD's bid kit, however, described the Meadowbrook complex as having only fifty-one units. Id. at A529.

he had failed to complete the project by the January 15, 2011 deadline. Id. at A1170.[6] At that point, HUD apparently suspended the performance of further inspections. Id.

### 7.  The Property Remains in Disrepair Some Five Years After the Closing; HUD Notifies Mr. Halim of Default

HUD's inspector returned to Meadowbrook on September 13, 2011—some eight months after the expiration of the second extended deadline—accompanied by, among others, the City's building inspector. Id. at A1173–74. He reported that the City had not issued any new permits since the stop-work order the preceding January and that, other than replacing some flooring in one building, Mr. Halim had performed no additional work since the inspector's December 2010 report. Id. at A1173. Additionally, the inspector reported that a termite infestation had been discovered in Building Two. Id. at A1173–74.

On September 23, 2011, Paula M. Carruth, the Director of HUD's Jackson, Mississippi Multifamily Program Center, prepared a memorandum for the Acting Director of HUD's Atlanta Multifamily Property Disposition Center. Id. at A1190. The memorandum described the condition of Meadowbrook and the state of its repairs based on the most recent inspection report. Id. Ms. Carruth noted that as of the date of the last inspection, "the project rehab had been on-going for 57 months with 24 of the 52 units having passed UPCS inspection." Id. She observed that "the quality of the repair work was found to be poor, with occupied units appearing not to meet Quality Housing Standards." Id. Further she stated that "[d]ue to the duration of the rehab and the buildings being exposed to the elements, the property appears to have deteriorated to the point that the existing structures can no longer be brought into compliance with HUD requirements and the City of Meridian code requirements." Id. Ms. Carruth recommended that the property be inspected by HUD's Real Estate Assessment Center and that, "if supported by the inspection, the section 8 contract be abated." Id. She further noted her understanding that the City of Meridian was planning to conduct an inspection to determine if the property should be condemned and demolished. Id.

By letter of December 2, 2011, HUD formally notified Mr. Halim that he was in violation of the Foreclosure Sale Use Agreement and the HAP Contract, based on a "failure to complete the repairs required by the Use Agreement and the HAP Contract and for failure to maintain units in a decent, safe and sanitary condition." Id. at A1191. If Mr. Halim did not correct these violations within thirty days, HUD warned, it would "terminate the HAP Contract and retain the balance of the cash repair escrow." Id.

HUD's inspector returned to the complex on January 25, 2012. Id. at A1194. Some work had been completed and the termite infestation had been addressed, but problems remained with all twelve remaining buildings, seven of which were vacant. Id. at A1195–98. Four of the nineteen occupied units in the five occupied buildings failed UPCS inspection. Id. at A1198. The inspector concluded that 89% of the originally required post-closing repairs had been completed,

---

[6] The stop-work order itself is not in the record.

but that this percentage did not account for additional repairs that would be needed as a result of intervening damage and deterioration. See id. at A1199.

On February 2, 2012, Scott Bearden, the Acting Director of HUD's Atlanta Multifamily Property Disposition Center, sent Mr. Halim a notice of default on both the Foreclosure Sale Use Agreement and the HAP Contract. Id. at A1219. He observed that "although the Department has given you ample time to complete the repairs, the property remains uninhabitable." Id. at A1220. He advised Mr. Halim that HUD was "initiating action to terminate the HAP Contract and relocate eligible residents" and that HUD intended to retain the balance of his cash repair escrow. Id. On February 8, 2012, HUD wrote to Mr. Halim notifying him that as a result of his violations and default, the HAP Contract was abated "effective immediately." Id. at A1221.

### B. Merits of Summary Judgment Motion

In Counts III and IV of his fourth amended complaint, Mr. Halim alleges that he in fact completed the required repairs at Meadowbrook, that HUD breached the use agreement by failing to release the funds from the repair escrow account, and that he has been damaged in the amount of "at least $328,062." 4th Am. Compl. ¶¶ 72–74. Additionally, he alleges that he maintained the property in compliance with the UPCS, and that HUD breached the HAP Contract by terminating it. Id. ¶¶ 76–77. Mr. Halim seeks "monetary damages as a result." Id. ¶¶ 76–78.

In his summary judgment motion, however, Mr. Halim takes a different tack. He no longer claims that he timely completed the required post-closing repairs. Instead, he argues that he "made steady progress" until it became impossible for him to finish making the repairs because the City of Meridian issued a stop-work order in January 2011. Pl.'s Mot. at 25. He argues that he is entitled to rescission of the Meadowbrook Foreclosure Sale Use Agreement based on the doctrine of impossibility. Id. at 26–28.

With respect to the HAP Contract, Mr. Halim similarly argues that the stop-work order made it impossible for him to maintain the property in accordance with the UPCS. Id. at 29. He also points out that the City of Meridian eventually issued certificates of occupancy for three of the buildings on the property. These certificates are dated February 16, 2012; March 23, 2012; and May 22, 2012. Pl.'s Mot., App. at A-6–8. According to Mr. Halim, the issuance of these certificates creates a factual dispute regarding whether he ultimately brought the complex into compliance with the UPCS standards. Pl.'s Mot. at 28–31.

Mr. Halim's arguments lack merit. First, "[p]erformance is only excused under [the impossibility] doctrine when it is objectively impossible." Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1294 (Fed. Cir. 2002). As the party asserting impossibility, Mr. Halim has the burden of proof. See Mass. Bay Transp. Auth. v. United States, 254 F.3d 1367, 1373 (Fed. Cir. 2001). Yet Mr. Halim has introduced no evidence to establish that it was objectively impossible for him to complete the required repairs or maintain the properties in compliance with the UPCS at any time during the four-year period after he closed on the property and before the City issued its stop-work order in January 2011.

Further, proving impossibility requires a demonstration of lack of fault on the party asserting it. Id. at 1373–74; see also United States v. Winstar Corp., 518 U.S. 839, 920 (1996) (Scalia, J., concurring) ("Generally, contract law imposes upon a party to a contract liability for any impossibility of performance that is attributable to that party's own actions."). Mr. Halim was granted two extensions to comply with his contractual obligations and with the City's requirements. The stop-work order which he claims made it impossible for him to complete the repairs was issued as a consequence of his own failure to meet the contractually imposed deadlines even after they were twice extended by a year.

In short, Mr. Halim's invocation of the impossibility doctrine as a grounds for avoiding his contractual obligations to make the required repairs and maintain the properties in compliance with the UPCS is unavailing. Further, the fact that the City of Meridian issued him certificates of occupancy for three buildings between February and May of 2012 is immaterial. For one thing, the property consisted of twelve buildings. Def.'s Mot., App. at A536. In addition, Mr. Halim was obligated to maintain the property in compliance with the UPCS on an ongoing basis. The numerous reports of the HUD inspector over a five-year period are unrebutted and show Mr. Halim did not meet these compliance requirements.

In short, in light of the undisputed facts, HUD was within its rights to retain the escrow amounts and to terminate the housing assistance payments for the Meadowbrook Apartments. The government is therefore entitled to judgment as a matter of law on Counts III and IV.

## V.   Motion for Summary Judgment as to Counts VI Through VIII (Beacon Light Property)

### A.  Material Facts Not in Dispute

#### 1.  The Bid Kit

Beacon Light-Goodwill Baxter Apartments (hereinafter "Beacon Light") is a 108-unit apartment complex in Henderson, North Carolina. Id. at A1222. At the time of the HUD foreclosure sale (June 12, 2007), the property was vacant. Id. at A1265. Its residents had been relocated after HUD closed the apartment complex in 2006 due to the distressed condition of the property. See id. (Letter from Mayor of City of Henderson, observing that the complex had been "a source of consternation . . . for quite some time" and that HUD closed it in 2006 "due to serious sanitation and minimum housing code violations").

The bid kit provided in connection with the foreclosure sale contained warnings and disclaimers regarding the physical condition of the complex. For instance, at the top of the cover page of the bid kit, in bold font, it stated that "[p]otential bidders should be aware that building '9', located at 432 Boddie Street, was damaged by fire and that there may have been some vandalism at the property." Id. at A1222. Also in bold font, the cover page provided that "[t]he high bidder will be required to complete all of the repairs noted in Attachment E Post Closing Repair Requirements plus repair to State and local code all fire damage/vandalism that has occurred or may occur prior to closing on the sale," and advised that "[t]his requirement should be factored into the bid." Id.

The bid kit also forewarned prospective purchasers that they bore the burden of determining for themselves whether there were any matters related to the property that might bear on their decision to purchase. Section 1 of the bid kit contained a paragraph entitled "Bidder's Due Diligence." Id. at A1224. It stated, again in bold font, that "[b]idders are encouraged to perform their own due diligence to gain a full understanding of the project and the conditions of sale before submitting a bid." Id. Similarly, Section 6 of the bid kit, entitled "Disclaimers," provided that "[b]idders interested in purchasing this project are expected to acquaint themselves with the property, and to arrive at their own conclusions as to physical condition, number and occupancy of revenue producing units, estimates of operating costs, repair costs (where applicable), and any other factors bearing upon valuation of the property." Id. at A1227.

Similarly, the bid kit stated, also in all bold font, that "all information provided is solely for the purpose of permitting parties to determine whether or not the property is of such type and general character as might interest them in its purchase, and HUD makes no warranty as to the accuracy of such information." Id. Further, prospective purchasers were advised that their "failure . . . to inspect, or be fully informed as to the condition of all or any portion of the property being offered, or condition of sale, will not constitute grounds for any claim, demand, adjustment, or withdrawal of a bid." Id.

### 2. The Purchase of the Complex

Mr. Halim purchased the Beacon Light complex at the foreclosure sale for $54,000. Id. at A1259.[7] Closing took place on August 28, 2007. Id. at A1251–52. HUD estimated that the repairs required at Beacon Light would cost over $5 million. Id. at 1245–48. The Foreclosure Sale Use Agreement required a letter of credit in the amount of $1,292,567 to guarantee their completion. Id. at A1228.

Unlike the other properties at issue in this case, which were to be maintained as affordable rental housing, the Beacon Light complex was sold with the understanding that it would be converted to home ownership for sale to income-eligible purchasers. Thus, under Rider 1 of the agreement, entitled "Conversion to Home Ownership," Mr. Halim was obligated to "complete the required repairs within twenty-four (24) months of closing, convert the property from rental to homeownership and sell the repaired homeownership units to income-eligible qualified purchasers for use as their primary residence." Id. at A1238, A1254.

---

[7] On August 10, 2007, Mr. Halim assigned all his "rights, title and interest in, to and under the Bid" to his son, named in the assignment document as "Sharif Halim." Def.'s Mot., App. at A1262. The younger Mr. Halim ultimately executed a quitclaim deed assigning his rights in the Beacon Light complex back to his father on June 26, 2012. Id. at A1380–82. For ease of reference, the Court will not distinguish between father and son when discussing the Beacon Light claims but will refer to both as "Mr. Halim."

### 3. Mr. Halim Fails To Perform Any Repairs Within the Twenty-Four-Month Post-Closing Deadline

Notwithstanding the terms of the Foreclosure Sale Use Agreement, Mr. Halim performed no significant repair or renovation of the property after the purchase. His inaction drew the ire and concern of local officials in the City of Henderson.

In a March 11, 2009 letter, William Melvin, the Director of HUD's Atlanta Multifamily Property Disposition Center, wrote to Mr. Halim reminding him of his obligation to complete all repairs to the complex by August 28, 2009. Id. at A1263. Mr. Melvin observed that the City of Henderson had notified HUD that since Mr. Halim's purchase "there ha[d] been no significant work initiated and that there ha[d] been several fires at the property." Id. Mr. Melvin advised Mr. Halim that he "must immediately notify HUD as to the status of the repairs," warning that if they were not completed by the deadline, he would be in default and HUD would take action "including retention of [the] cash escrow." Id.

Five days later, on March 16, 2009, Mr. Halim requested an extension of time to complete the repairs. Id. at A1264. Mr. Melvin responded by letter of June 3, 2009. Id. He told Mr. Halim that HUD would only consider his request for an extension if he submitted a work plan identifying the expected completion date for the repairs. Id. The record does not contain any indication that Mr. Halim responded to this letter or otherwise submitted a work plan.

Some five additional months elapsed, again without any significant progress in the performance of the required repairs or conversion of the property to homeownership. On August 12, 2009, a few weeks before the expiration of the twenty-four-month deadline, the mayor of the City of Henderson elevated the City's concerns by sending a letter to HUD Secretary Shaun Donovan, requesting his intervention. Id. at A1265–68. The mayor characterized the Beacon Light Apartments as "a major source of blight within the neighborhood in which it is located and within the city-at-large." Id. at A1265. The mayor reported to Secretary Donovan that since the sale of the property to Mr. Halim in 2007, "the property ha[d] further deteriorated, and significantly so," due to fire and vandalism. Id. In fact, as of the date of his letter, the mayor observed, no plans had been submitted to the City to bring the property into compliance with its housing code, even though HUD's two-year compliance deadline was about to expire. Id.

The mayor also advised Secretary Donovan that the Henderson City Council had passed an ordinance to condemn the property and that it was prepared to enforce an ordinance to demolish the property unless it could be brought into compliance with the City's minimum housing code requirements and with deed restrictions requiring conversion of the property to homeownership. Id. at A1266. The mayor further advised that the City Council had passed a resolution requesting that a portion of the repair escrow held by HUD be provided to the City to cover the costs of demolition. Id. He noted, however, that the City still hoped to work with HUD and Mr. Halim to avoid demolition and to rehabilitate the property. Id. at A1266–68.

**4.   With the Twenty-Four-Month Deadline Expired, the City Denies Mr. Halim's Requests for a Special Use Permit and Variance**

On October 9, 2009, Mr. Halim applied to the City for a special use permit and a zoning variance. Id. at A1272–73. Beacon Light was set back eighteen feet from the street, which meant that it was out of compliance with a city ordinance requiring a setback of at least thirty-five feet. See id. at A1273–76. The special use permit was requested "[t]o allow a[] unified residential development to be established." Id. at A1272. The variance was sought "[t]o modify setback requirements." Id. at 1273.

Mr. Halim was apparently unaware before he purchased the property that it failed to meet local setback and density requirements. He testified that the purpose of his request for a special use permit and variance was to allow him to perform the repairs required to comply with his obligations under the sale agreement. Id. at A1544; see also Pl.'s Mot., Halim Decl. ¶¶ 5–7 (observing that the City refused to issue permits needed to make repairs because Beacon Light did not meet the City's density and setback requirements).

While Mr. Halim's requests were pending, on October 30, 2009, the mayor again wrote to a HUD official in Washington, D.C.—this time Janet Golrick, Associate Deputy Assistant Secretary in the Multifamily Housing Division. Def.'s Mot., App. at A1277. He complained about the "continuing dilapidated and blighted conditions of th[e] apartments." Id. He reported that "[o]ther than mowing the weeds that were three to five feet tall, after an order for mowing was issued by the city, and installing a gate to secure the property . . . nothing has happened with the property other than the fires that have heavily damaged and/or destroyed four buildings." Id. at A1278. The mayor provided photographs showing the proximity of the Beacon Light Apartments to a well-maintained single-family neighborhood. Id. at A1279. He expressed frustration about what he viewed as a lack of cooperation on Mr. Halim's part evidenced by, among other things, Mr. Halim's failure to demonstrate that he had obtained a construction loan sufficient to renovate the property. Id. at A1278.

Finally, the mayor requested HUD's assistance in "bringing Beacon Light into compliance with City building codes and conversion to home ownership." Id. at A1279. To that end, he stated, and given Mr. Halim's lack of cooperation, "the City Council is requesting HUD to provide an amount of funds from Mr. Halim's $1.2M cash bond to demolish the property in order to remove the blight [fro]m the neighborhood." Id.

On December 8, 2009, the City denied Mr. Halim's requests for a special use permit and a zoning variance. Id. at A1272–76, A1354. As to the special use permit, the zoning board concluded that "the proposed use will materially and adversely affect public health, safety and welfare and will further substantially injure the value of adjoining and abutting properties and is not in harmony with the area in which it is located." Id. at A1275. The board noted that "the subject property constitutes an area of high crime and drug activity," that "the existing buildings (which do not comply with the present building setback requirements of the Zoning Ordinance) have been the subject of at least three fires in the last three years," and that "there is raw sewage on the ground, which sewage had spilled over into the adjoining properties." Id. Accordingly, the board concluded that "[f]ire and police, street and sewer facilities could all be better used to serve the property if it were converted to single family residences." Id.

As to the variance, the board concluded, among other things, that the setback was "reasonably discernible at the time that the applicant purchased the property, [and that] the Applicant has done nothing to remove the burned out buildings or attempted to remedy or repair the buildings since the fires . . . thus making the conditions worse." Id.

Mr. Halim was formally notified of the City's decision by letter of December 14, 2009. Id. at A1354. In that letter, the City advised Mr. Halim that its Code Compliance Department intended to "move towards bringing the property into compliance through demolition." Id.

### 5.  Mr. Halim's Communications with HUD Officials Regarding the Resale of the Property to HUD

In the meantime, on December 1, 2009, while his requests for a special use permit and variance were pending, Mr. Halim met with Howard Mayfield and Courtland Wilson, officials in HUD's Washington, D.C. headquarters. See id. at A1350. After the meeting, Mr. Halim wrote two letters. First, on December 4, 2009, he wrote a brief letter to William H. Melvin, the Director of HUD's Atlanta Multifamily Property Disposition Center. Id. In that letter, Mr. Halim stated that "[p]er [his] discussion with Mr. Mayfield and Mr. Wilson on December 1st, 2009 . . . [he was] giving back the NC property aka B[e]acon Light Apartments to HUD." Id. He continued that "[t]he transfer of ownership to HUD is subject to the following conditions: I) Full refund of the purchase price. II) Full refund of the cash escrow held by HUD in lieu of the LOC. III) Full Release of the present owner of the record from any liability regardless of its nature associated with the subject property." Id.

A few days later, on December 7, 2009, Mr. Halim wrote a second letter, this time directly to Mr. Mayfield and Mr. Wilson. In this letter, he offered what he characterized as a "summary of [the] conversation at the [December 1] meeting in writing." Id. at A1351–53. The summary referenced Mr. Halim's grievances against HUD regarding the Nichols Townhomes, Schenectady 40, and Meadowbrook Apartments. It did not include any discussion of the Beacon Light Apartments. See id.

On February 3, 2010, Robert G. Iber, HUD's Acting Director of Asset Management, wrote to Mr. Halim "in follow-up to [his] recent meeting with HUD staff to discuss the Department's foreclosure requirements for the subject projects." Id. at A1355. In this letter, Mr. Iber referenced Mr. Halim's disputes concerning the Nichols Townhomes, Schenectady 40, and the Beacon Light Apartments. Id. at A1355–56. As to Beacon Light, Mr. Iber stated, among other things, that "HUD's discussion regarding the possible acceptance of the deed on this property has not been decided." Id. at A1356.

### 6.  Notice of Default—Demolition of Property

On June 29, 2010, Mr. Iber wrote to Mr. Halim notifying him that he was in default of his obligations under the Foreclosure Sale Use Agreement. Id. at A1358. Mr. Iber noted that under the agreement, Mr. Halim was obligated to make specified repairs by August 28, 2009, but that "no major repairs to the Project or corrections to violations of the Use Agreement have been made." Id. He also noted that the City had informed HUD that Beacon Light had "suffered from fire damage and ha[d] been found to be hazardous to the public health, safety and welfare of the

residents of the City." Id. Because "the repair period ha[d] expired and no major repairs ha[d] been made and the city ha[d] condemned the Project as a public hazard," Mr. Iber informed Mr. Halim, HUD intended to exercise its rights under the foreclosure sale agreement to use the funds from the letter of credit "in a manner which [HUD] deems appropriate." Id. This might include, Mr. Iber stated, "reimbursing the City for actions associated with remediation of the conditions at the Project." Id.

On October 27, 2010, HUD entered into a Memorandum of Understanding with the City, in which it agreed to use the proceeds from the letter of credit Mr. Halim provided to reimburse the City for its reasonable costs in demolishing the Beacon Light Apartments. Id. at A1359–61. HUD released $399,900 from the escrowed funds to the City for the demolition on September 6, 2011. Id. at A1368. The City notified HUD that the property had been demolished on September 14, 2011. Id.

## B. Merits of Motion for Summary Judgment

### 1. Mutual Mistake of Fact (Count VI)

In Count VI of his complaint, Mr. Halim claims that he is entitled to rescission of the Beacon Light use agreement and a refund of his escrow funds because of a mutual mistake of material fact regarding his ability to make repairs on the property. 4th Am. Compl. ¶ 88. He alleges that—because the complex did not comply with the City's density and setback requirements—he was denied the permits he needed to make the repairs. Id. ¶¶ 42–43. The "mistake of fact," according to Mr. Halim, was the parties' assumption that Beacon Light was not out of compliance with those requirements. Id.

It is well established that "[w]here there has been a mutual mistake of material fact, resulting in a contract which does not faithfully embody the parties' actual intent, reformation, [and] rescission . . . may be available to the party adversely affected." Dairyland Power Co-op, 16 F.3d at 1202. In this case, however, Mr. Halim's mutual mistake of fact claim fails as matter of law. A party "cannot rely upon a mutual mistake of fact to avoid enforcement of a contract where . . . the 'mistake' is a result of that party's failure to exercise due diligence." Canpro Invs. Ltd. v. United States, 130 Fed. Cl. 320, 342 (2017); see also Griffin & Griffin Expl., LLC v. United States, 116 Fed. Cl. 163, 175 (2014) (same). "Ignorance is never sufficient to constitute a ground of relief if it appears that the requisite knowledge might have been obtained by reasonable diligence. He who averts knowledge to himself cannot later claim lack of knowledge." Collins v. United States, 532 F.2d 1344, 1348 (Ct. Cl. 1976) (citation omitted).

Mr. Halim's lack of due diligence here is fatal to his mutual mistake of fact claims. Mr. Halim appears to be in the business of purchasing apartment complexes from HUD at foreclosure sales. The Court would expect, therefore, that he would have undertaken the steps necessary to familiarize himself with whatever local ordinances might bear upon his ability to repair and renovate the complex. See Edwards v. United States, 19 Cl. Ct. 663, 672 (1990) (rejecting misrepresentation claim and observing that "one would assume that reasonable and prudent business people would operate through a lawyer to assist them in those matters relative to zoning laws, title, and other related municipal matters"); see also id. at 674 (observing that relief is rarely provided for mistakes of law because "both parties are generally held to have knowledge

of the laws and regulations affecting their business dealings") (quoting <u>C & L Constr. Co. v. United States</u>, 6 Cl. Ct. 791, 798 (1984)).

In any event, "[w]here the party seeking reformation alleges an innocent mutual mistake, that party must establish . . . that the contract did not place the risk of mistake upon the party seeking reformation." <u>Roseburg Lumber Co. v. Madigan</u>, 978 F.2d 660, 668 (Fed. Cir. 1992). Here, the contractual documents clearly placed the risk of mistake as to the property's conformity with local ordinances on the purchaser. Specifically, the bid kit encouraged bidders "to perform their own due diligence to gain a full understanding of the project and the conditions of sale before submitting a bid." Def.'s Mot., App. at A1224. It also warned that a "[b]idder's failure to inspect or to be fully informed as to any factor bearing upon the valuation of the property, shall not affect the liabilities, obligations, or duties of HUD, [and shall] not be a basis for termination of this sale or for the return of any extension fees paid." <u>Id.</u> at A1231. Prospective purchasers were "expected to acquaint themselves with the property, and to arrive at their own conclusions as to; physical condition . . . and <u>any other factors bearing upon the valuation of the property.</u>" <u>Id.</u> at A1227 (emphasis added).

A property's compliance (or noncompliance) with a local zoning ordinance is clearly a factor that bears on its valuation. And the bid documents placed the risk of Mr. Halim's "failure . . . to be fully informed" as to that factor squarely with him. For these reasons, the Court rejects Mr. Halim's claims based on mutual mistake of fact. The government is therefore entitled to judgment as a matter of law as to Count VI.

### 2.  Plaintiff's Claim Regarding HUD's Breach of an Oral Contract (Count VII)

Mr. Halim alleges that on December 1, 2009, he entered into an oral agreement with Courtland Wilson, HUD's then-Acting Director of Asset Management. Pursuant to this oral agreement, Mr. Halim alleges that HUD agreed to refund the purchase price and return the funds in escrow for Beacon Light in exchange for Mr. Halim and his son returning the deed for the property to HUD. 4th Am. Compl. ¶¶ 90–91. Mr. Halim further alleges that HUD is in breach of this oral agreement because it has refused to refund the purchase price or the funds held in escrow. <u>Id.</u> ¶ 93.

Mr. Halim's claim fails as a matter of law. Even assuming that there was, in fact, an oral agreement for the resale of the property by Mr. Halim and a HUD employee with authority to enter such a contract (a claim that is dubious at best), such a contract would be unenforceable under state law.

Both parties agree that North Carolina law governs whether there exists a valid contract for the repurchase of the property by HUD. <u>See</u> Def.'s Mot. at 61; Pl.'s Mot. at 13. Under North Carolina law, when a promise involves the sale or transfer of land, it must satisfy the Statute of Frauds. N.C. Gen. Stat. § 22-2 (2016); <u>see also</u> Restatement (Second) of Contracts § 125 (1981) ("A promise to transfer to any person any interest in land is within the Statute of Frauds."). To satisfy the Statute of Frauds, all material terms of a contract must be contained in a writing that is signed by the party against whom enforcement is sought. <u>See id.</u> at § 131; <u>see also</u> <u>Lamle v. Mattel, Inc.</u>, 394 F.3d 1355, 1361 (Fed. Cir. 2005). It is undisputed, however, that there is no such writing regarding the transfer of Beacon Light back to HUD.

Mr. Halim argues nevertheless that he can enforce the alleged oral contract on the grounds that the doctrine of promissory estoppel is an exception to the Statute of Frauds under North Carolina law. Pl.'s Mot. at 13. In support of that proposition, he cites Allen M. Campbell Co. v. Virginia Metal Industries, Inc. 708 F.2d 930, 934 (4th Cir. 1983); see id. at 14. But contrary to Mr. Halim's argument, North Carolina does not recognize claims based on promissory estoppel as exceptions to the Statute of Frauds. See Rice v. Vitalink Pharmacy Servs., Inc., 124 F. Supp. 2d 343, 347 (W.D.N.C. 2000) (observing that "Campbell has been expressly rejected by the courts of North Carolina" and "declin[ing] to accept the plaintiff's invitation to adopt the reasoning of Campbell in favor of the clear controlling law of North Carolina," under which "promissory estoppel may not be used as an affirmative cause of action").

Further, to the extent that Mr. Halim intends to pursue a claim based on promissory estoppel, this Court would have no jurisdiction to consider it. See Twp. of Saddle Brook v. United States, 104 Fed. Cl. 101, 111 (2012) ("[P]romissory estoppel theory does not fall within the jurisdiction granted to the court by the Tucker Act."). Accordingly, the government is entitled to summary judgment as to Count VII of the complaint.

### 3. Plaintiff's Claim Regarding HUD's Breach of Beacon Light Use Agreement (Count VIII)

Finally, Mr. Halim alleges that HUD breached the Beacon Light use agreement by agreeing to the property's demolition and by providing funds from the escrow account to pay for the demolition. 4th Am. Compl. ¶ 100. He does not challenge HUD's contractual authority, in the event of a breach, to retain the escrow funds and devote them to an appropriate use as it sees fit. Instead, he contends that he was excused from his obligation to perform the repairs required under the contract by the doctrine of impossibility. Pl.'s Mot. at 19. Specifically, he contends that the City's denial of his request for a variance precluded him from doing so. Id. at 19–20. This claim also fails as a matter of law.

First, the variance request was not even presented to the City for determination until after Mr. Halim's deadline to complete repairs had expired. Additionally, the doctrine of impossibility cannot be employed "where the 'language or the circumstances' indicate allocation of the risk to the party seeking discharge." Winstar, 518 U.S. at 908 (citing Restatement (Second) of Contracts § 261)). Here, as explained above, Mr. Halim bore the risk that Beacon Light might not be in compliance with local zoning ordinances. Accordingly, the government is entitled to summary judgment as to Count VIII of the complaint.

## VI.   Motion for Summary Judgment as to Counts IX, X, and XI (Highland Village)

### A. Material Facts Not in Dispute

Highland Village is a 300-unit apartment complex in Montgomery, Alabama. Def.'s Mot., App. at A1383. HUD held a foreclosure sale for the property on September 14, 2006. Id. HUD was unable to close with the successful bidder at that sale. It therefore put the property up for sale again on March 22, 2007. See id. at A1424–25.

The bid kit for the second foreclosure sale contained a warning at the top of the cover page, stating in bold font that "[p]otential bidders should be aware that there has been on-going vandalism at the property." Id. at A1425. It further stated that "[t]he high bidder will be required to complete all of the repairs noted in Attachment E Post Closing Repair Requirements plus repair to State and local code all vandalism that has occurred or may occur prior to closing on the sale." Id. "This requirement," HUD cautioned, "should be factored into the bid." Id. Further, the kit stated, bidders were "encouraged to perform their own due diligence to gain a full understanding of the project and the conditions of sale before submitting a bid." Id. at A1427.

In paragraph eight of Section 1 of the bid kit, HUD repeated the warning from the cover page, again in bold font. Id. The bid kit also contained a disclaimer provision that stated, among other things, that "[a]ny bid submitted shall be deemed to have been made with full knowledge of all the terms, conditions and requirements contained in this Invitation for Bid and in any Addendum hereof," and that "[w]hile care has been exercised to assure accuracy, all information provided is solely for the purpose of permitting parties to determine whether or not the property is of such type and general character as might interest them in its purchase, and HUD makes no warranty as to the accuracy of such information." Id. at A1430.

HUD informed potential bidders that the estimated repair costs totaled $5,623,991. Id. at A1432. It also included in the bid kit multiple photographs of the property that revealed its then-existing condition. Id. at A1461–64.

Mr. Halim visited Highland Village prior to the first foreclosure sale in September 2006, and he drove by the apartments again prior to the second sale six months later. See id. at A1534. He testified at his deposition that on his first visit, the property was "livable" and so he made an offer on it, but was not the high bidder. Id. According to Mr. Halim, he did not get out of his car the second time because he feared for his safety. Id. He testified that on this second visit "obviously, for whatever reason, the [owner] of the property [had] some issues with HUD and he was trying to do something with them, so he completely was kind of violent, [and took] all the windows off." Id.; see also id. at 1547 (observing that the complex looked different on the outside when he drove by because "apparently there was a lot of bad people vandalization" and "the ex-owner apparently was angry").

Mr. Halim submitted the high bid at the second foreclosure sale. See id. at A1466. He and HUD executed a document entitled, "Terms and Requirements of Foreclosure Sale – Acknowledgement by Bidder." Id. at A1467–70. It stated "As-Is Sale; No Representations" and continued that the "[b]idder shall accept the property 'as is.' HUD makes no representations or warranties concerning the physical condition of the Property." Id. at A1468. It further stated that "[b]idder acknowledges that the purchase price set forth in this Acknowledgement is based on Bidder's evaluation of the project and not upon any representations by HUD. Bidder's failure to inspect, or to be fully informed as to any factor bearing upon the valuation of the Property, shall not affect the liabilities, obligations or duties of HUD." Id.

Closing took place on June 22, 2007, at which time Mr. Halim again executed a Foreclosure Sale Use Agreement. Id. at A1476; see also id. at A1501. Under Rider 2 of the agreement, Mr. Halim was required to maintain all 300 units of the property as affordable rental

housing for a period of twenty years. Id. at A1494. The Agreement required Mr. Halim to make the specified post-closing repairs within twenty-four months of closing. Id. at A1481.

By July 26, 2010, more than a year after the twenty-four-month repair deadline had passed, HUD had determined that Mr. Halim had completed only 6% of the required repairs at the property. Id. at A1505. It released $85,336 to Mr. Halim from the cash escrow for repairs, leaving a balance of $1,320,662. Id. After an inspection in August 2010 revealed that Mr. Halim had completed only 10% of the required repairs, HUD released another $46,560. Id. at A1506. The record does not reveal any further progress at Highland Village or further release of the cash escrow.

## B. **Jurisdiction**

The Tucker Act provides the United States Court of Federal Claims with "jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1) (2012). Each claim in Mr. Halim's fourth amended complaint is founded upon a contract with HUD relating to the sale or purchase of HUD properties and therefore falls within this Court's general subject matter jurisdiction.

The government asserts, however, that Mr. Halim's claims relating to Highland Village are barred by the Court of Federal Claims' six-year statute of limitations. Def.'s Mot. at 71–74. Thus, 28 U.S.C. § 2501 states that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." A cause of action accrues under the Tucker Act when "all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money." Martinez v. United States, 333 F.3d 1295, 1303 (Fed. Cir. 2003) (en banc) (quoting Nager Elec. Co. v. United States, 368 F.2d 847, 851 (Ct. Cl. 1966)).

Here, Counts IX, X, and XI of the complaint seek rescission of the Highland Village contract and a return of the amount held in escrow based on alleged misrepresentations of fact and/or unilateral or mutual mistakes of fact concerning the deterioration in the condition of the property between the first and second foreclosure sales. 4th Am. Compl. ¶¶ 102–18. These claims are based on the theory that HUD knew or should have known that the apartments at Highland Village "had been gutted"; that the tenants had moved out between the first and second foreclosure sales; and that at the time of the sale Mr. Halim was unaware that conditions at the complex had changed so significantly between the two sales. Id.

The causes of action set forth in Counts IX, X, and XI accrued when Mr. Halim became aware of or should have become aware of the alleged misrepresentations and/or mistakes. See Cambridge Plating Co. v. Napco, Inc., 85 F.3d 752, 763–64 (1st Cir. 1996); Harvey v. Martin, 714 F.2d 650, 653 (6th Cir. 1983). In this case, as described above, Mr. Halim testified at his deposition that within one month of closing (i.e., around July 2007) he realized that the property was in worse condition than he had expected at the time of bidding. Id. at A1547.[8] Yet Mr.

---

[8] In a declaration submitted with his response to the government's motion for summary judgment, Mr. Halim states, contrary to his earlier deposition testimony, that "[s]ince all the

  
Halim did not file his fourth amended complaint adding causes of action with respect to the Highland Village property until January 9, 2015, nearly seven-and-a-half years later.

Mr. Halim argues that his claims regarding Highland Village are nonetheless timely because he filed his first complaint in this case within six years of when he knew or should have known of the alleged mistakes or misrepresentations made with respect to Highland Village. Pl.'s Mot. IX–XI at 1–2. This argument lacks merit.

Rule 15(c) of the Rules of the Court of Federal Claims ("RCFC") provides that an amendment to a complaint "relates back to the date of the original pleading when," among other things, "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." RCFC Rule 15(c)(1). In determining whether an amendment relates back, the court looks to the "notice given by the general fact situation set forth in the original pleading." See Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1369 (Fed. Cir. 2004) (quoting Snoqualmie Tribe v. United States, 372 F.2d 951, 960 (Ct. Cl. 1967)).

Here, the Highland Village claims do not arise out of the same "conduct, transaction, or occurrence" as those set out in the earlier pleadings. The Highland Village claims relate to different sales, different contracts, and different properties. The operative facts underlying the claims of misrepresentation and mistake of fact regarding Highland Village are unrelated to those involving the claims made regarding the other properties. The government could not have known until Mr. Halim amended the complaint to add the Highland Village claims that he would do so. The additional claims in Mr. Halim's fourth amended complaint therefore do not relate back to any of the earlier complaints.

Finally, Mr. Halim argues that, for a variety of reasons, the running of the limitations period should be equitably tolled with respect to Counts IX, X, and XI. Pl.'s Mot. IX–XI at 2–3. This argument also lacks merit. The limitations period set forth in the Tucker Act is jurisdictional. Shoshone Indian Tribe of Wind River Reservation v. United States, 672 F.3d 1021, 1029 (Fed. Cir. 2012) (citing John R. Sand & Gravel Co. v. United States, 552 U.S. 130,

---

events took place almost eleven years ago, the exact date that I was physically at Highland is difficult to remember now," and that "[i]t could [have] been around the end of 2007 or the beginning of 2008." Pl.'s Mot. IX–XI, 2d Decl. of Ahmed Halim ¶ 28, ECF No. 80-1. But assuming that the passage of time makes it difficult for Mr. Halim to now recall when he realized the alleged "misrepresentations" or mistakes of fact, his deposition testimony was provided more than two years ago, and thus closer in time to the events at issue. And in any event, "[a] party cannot create an issue of fact by supplying an affidavit contradicting his prior deposition testimony, without explaining the contradiction or attempting to resolve the disparity." Sinskey v. Pharmacia Ophthalmics, Inc., 982 F.2d 494, 498 (Fed. Cir. 1992), abrogated in part on other grounds by Pfaff v. Wells Elecs., Inc., 525 U.S. 55 (1998), as recognized by Invitrogen Corp. v. Biocrest Mfg., L.P., 424 F.3d 1374, 1379–80 (Fed. Cir. 2005); see also Burns v. Bd. of Cty. Comm'rs, 330 F.3d 1275, 1281–82 (10th Cir. 2003) ("[Courts] will disregard a contrary affidavit . . . when it constitutes an attempt to create a sham fact issue.") (quotation omitted); Grand Acadian, Inc. v. United States, 87 Fed. Cl. 193, 206–07 (2009).

136–39 (2008)). Compliance with the six-year limitations period is a "condition of the government's waiver of sovereign immunity, and as such, must be strictly construed." <u>Hopland Band of Pomo Indians v. United States</u>, 855 F.2d 1573, 1576–77 (Fed. Cir. 1988). Accordingly, the Court's statute of limitations is not subject to equitable tolling. <u>See</u> <u>John R. Sand & Gravel Co.</u>, 552 U.S. at 133–34; <u>see also</u> <u>Young v. United States</u>, 529 F.3d 1380, 1384 (Fed. Cir. 2008).

## CONCLUSION

For the foregoing reasons, Counts IX through XI are **DISMISSED** without prejudice for lack of subject matter jurisdiction. Additionally, Plaintiff's motion for summary judgment as to Counts III, V, VI, VII, and VIII is **DENIED** and the government's motion for summary judgment as to all remaining counts (Counts I through VIII) is **GRANTED**. The Clerk is directed to enter judgment accordingly. Each side shall bear its own costs.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge
